UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

ERIC X. RAMBERT,                                          :
                                                         :
                    Plaintiff                            :     No. 4:CV-09-0634
                                                         :
          v.                                             :     (Judge Nealon)
                                                         :                    FILED
JEFFREY A. BEARD, et al.,                                :                  SCRANTON
                                                         :
                    Defendants                           :          MAR 0 7 2012

                            **MEMORANDUM**          Per _____
                                                         DEPUTY CLERK

**Background**

          Plaintiff, Eric X. Rambert, a prisoner formerly confined at the State Correctional Institution,

Dallas, ("SCI-Dallas"), Pennsylvania, filed the above civil rights action pursuant to 42 U.S.C. §

1983.[1]  On April 7, 2009, the action was removed to federal court from the Luzerne County Court

of Common Pleas.  On June 15, 2009, Plaintiff filed an amended complaint. (Doc. 19).  The named

Defendants in Plaintiff's amended complaint are Dr. Jeffrey Beard, Secretary, Department of

Corrections; and the following employees of SCI-Dallas: James T. Wynder, former SCI-Dallas

Superintendent; Michael Klopotoski, current SCI-Dallas Superintendent; Joseph Zakaraukas,

Security Captain; Dorina Varner, Acting Chief Grievance Coordinator; Cindy Watson, former

Chief Grievance Coordinator; Robin Lucas, Grievance and Litigation Coordinator; Patricia

Ginocchetti, Health Care Administrator; Lea Liputs, current Health Care Administrator; Thomas

Leskowsky, R.N.; Donald O'Brien, Physician's Assistant; Cheryl Wisniewski-Bunk, Physician's

Assistant; Charles McKeown, Hearing Examiner; and the following Program Review Committee

members: Norman Demming, Jerry Walsh and Vincent Mooney.

---

1.    On October 29, 2009, plaintiff was transferred to the State Correctional Institution, Coal
Township, Pennsylvania. (See Doc. 56).

By Memorandum and Order dated March 15, 2010, Defendants Wynder, Klopotoski, Varner, Watson, Lucas, Mooney, Demming, Walsh, McKeown and Beard were dismissed from this action. See (Doc. 66, Memorandum and Order). The remaining Defendants are Captain Zakarauskas, Registered Nurse Supervisor Liput, former Corrections Health Care Administrator Ginocchetti, former Registered Nurse Leskowsky, and Physicians Assistants Donald O'Brien and Cheryl Wisniewski-Bunk. Id. The remaining issues for resolution are Plaintiff's Fourteenth Amendment due process claims with respect to the confiscation of his property from K.A.M. Inc. and the assessment of medical co-payments from his inmate account, and Plaintiff's Eighth Amendment medical claim. Id.

Presently before the Court are Defendants' motions for summary judgment. (Docs. 103, 108). The parties have fully briefed the issues and the motions are now ripe for disposition. For the reasons that follow, the Court will grant the motions.

## I.  Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a) "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Anderson, 477 U.S. at 248; Gray v. York

2

Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson,

477 U.S. at 257; Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America,

927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the

facts and all reasonable inferences in favor of the nonmoving party.  Moore v. Tartler, 986 F.2d 682

(3d Cir. 1993); Clement v. Consolidated Rail Corporation, 963 F.2d 599, 600 (3d Cir. 1992); White

v. Westinghouse Electric Company, 862 F.2d 56, 59 (3d Cir. 1988).  In order to avoid summary

judgment, however, parties may not rely on unsubstantiated allegations.  Parties seeking to

establish that a fact is or is not genuinely disputed must support such an assertion by "citing to

particular parts of materials in the record," by showing that an adverse party's factual assertion

lacks support from cited materials, or demonstrating that a factual assertion is unsupportable by

admissible evidence. FED. R. CIV. P. 56(c)(1); see Celotex, 477 U.S. at 324 (requiring evidentiary

support for factual assertions made in response to summary judgment).  The party opposing the

motion "must do more than simply show that there is some metaphysical doubt as to the material

facts." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986).  Parties must

produce evidence to show the existence of every element essential to its case that they bear the

burden of proving at trial, for "a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U .S. at 323;

see Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).  Failure to properly support or contest

an assertion of fact may result in the fact being considered undisputed for the purpose of the

3

motion, although a court may also give parties an opportunity to properly provide support or opposition. FED. R. CIV. P. 56(e).

## II.   <u>Statement of Facts</u>

From the pleadings, declarations and exhibits submitted therewith, the following facts can be ascertained as undisputed.

### 1. <u>Confiscation of Religious Literature</u>

Rambert has been a member of the Nation of Islam for about twenty-six (26) years. (Doc. 106, Att. 1, Rambert Deposition at 102). This is the same group headed by Louis Farrakhan. <u>Id</u>. Rambert considers himself a Muslim. <u>Id</u>. As a member of the Nation of Islam, he prays five times a day and fasts twice a month. <u>Id</u>. at 103.

Prior to the confiscation of his mail on September 5, 2007, Plaintiff had not received anything personally from K.A.M., Inc. <u>Id</u>. at 105. K.A.M. stands for Karim Abdul Muhammad. <u>Id</u>. This is the name of the founder of the Nation of Islam. <u>Id</u>. K.A.M., Inc. is a business entity to the Universal Nation of Islam. <u>Id</u>. The Universal Nation of Islam is a branch of the Nation of Islam. <u>Id</u>. at 106. Rambert is a member of both the Universal Nation of Islam and the Nation of Islam. <u>Id</u>. The two organizations do not have different beliefs or practices. <u>Id</u>. K.A.M., Inc. is located in Berkeley, California. <u>Id</u>. at 107. Plaintiff ordered several different lesson manuals and books from K.A.M., Inc., which amounted to $47.00. <u>Id</u>. He does not have written down anywhere exactly what he ordered. <u>Id</u>. He also does not have any receipts for the books that he ordered from K.A.M., Inc. <u>Id</u>. at 108.

Defendant Zakarauskas is currently employed by the Pennsylvania Department of Corrections as the Major of the Guard the State Correctional Institution at Dallas ("SCI-Dallas").

(Doc. 107, Att. 3, Declaration of Joseph Zakarauskas).  He has held that position since January of 2010.  Id.  Prior to that, he held the position of Corrections Officer 4.  Id.  As a Corrections Officer 4, Zakarauskas held the title of Intelligence Captain at SCI-Dallas.  Id.  As part of his duties as Intelligence Captain, he coordinated and conducted intelligence gathering on Security Threat Groups.[2]  Id.  He also handled and secured evidence obtained from investigations and maintained the chain of custody.  Id.  A total of two Security Lieutenants reported to Zakarauskas. Id.  The Intelligence Captain is also responsible for coordinating random cell searches and maintaining the documentation for each cell search.  Id.  A random cell search will generally be performed by Search Team members assigned to the Security Office. Id.  All contraband and state issued items removed from the cell must be documented on a Confiscated Items Receipt (DC-154A) and/or Receipt for Property Form (DC-436). Id.

On September 5, 2007, Security Team Officer Golanski issued Plaintiff Confiscated Items Receipt, No. A. 707436, notifying him that a "manilla envelope from K.A.M. Inc." was confiscated from his cell during a random cell search and was forwarded to security for review.  (Doc. 106, Att. 2, Ex. 1, Confiscated Items Receipt).

On September 15, 2007, Plaintiff filed Inmate Grievance No. 200984, challenging the confiscation of the manilla envelope and its contents.  (Doc. 106, Att. 2, Ex. 1, Official Inmate Grievance No. 200984).  Specifically, Plaintiff states that he "wrote to Capt. Zakarauskas on 9.6.07 in which his reply did not specify where, when and how this was confiscated, only that they will not be returned as if they were confiscated out of my cell, they were not." Id.

---

2.    A Security Threat Group, is "[g]roups of individuals that have been identified as a possible threat to the security, safety, and or operation of the facility due to having members incarcerated within the DOC." Id.

On September 23, 2007, Grievance Officer Miller responded to Plaintiff's grievance with the following:

> I have been assigned as the grievance officer to investigate your complaints against alleged illegal search and seizure, violations of the inmate handbook and violations of the State and U.S. Constitution.
>
> The material confiscated was identified by the Security Office as being affiliated with a Security Threat Group, specifically, UNOI/K.A.M. Inc. As such, it was deemed contraband and confiscated. You claim that material from UNOI/K.A.M. Inc. is religious material, however, since the Department of Corrections had identified UNOI/K.A.M. Inc. as a Security Threat Group, staff will continue to follow policy which dictates that UNOI/K.A.M. Inc. material is deemed contraband and will be confiscated and disposed of according to policy.
>
> You claim that you do not know when or where the material was confiscated but in your grievance you state it was received in the mail. You also claim that contraband confiscated form the mail shall be returned to the sender, of which you are partially correct. You failed to include the complete section for which you referred, which states and I quote from DC-ADM 803 VI.E.7. "Incoming mail containing contraband shall be confiscated and held for further inspection and disposition. The contraband shall be returned to the sender (if known), or it shall be destroyed."
>
> Based upon the above facts, you were not subject to an illegal search and seizure and your grievance is denied. I encourage you to remain misconduct free, follow all Department of Corrections Policies and contact your Unit Management Team with any concerns you might have. If you wish to have the contraband returned to the sender, then I suggest that you contact the Security Officer and at the conclusion of their inspection, they will dispose of the material properly.

(Doc. 106, Att. 2, Ex. 1, Official Inmate Grievance Initial Review Response).

Plaintiff filed an appeal to Superintendent Wynder, who responded on November 30, 2007 with the following:

> I have reviewed grievance #200984, the Grievance Officer's response, and your subsequent appeal of said grievance. My decision is as follow:
>
> Lt. Miller was assigned as Grievance Officer and has adequately responded to your grievance. As you were informed, the material confiscated was identified by the Security Office as being affiliated with a Security Threat Group. The documentation

6

is deemed contraband and therefore was confiscated.  As you were informed, you were not subject to an illegal search and seizure of documents.  Staff followed proper procedure and policy by confiscating the material.

I concur with the Grievance Officer's findings and I uphold the initial response.

(Doc. 106, Att. 2, Ex. 1, Appeal of Grievance #200984).

On December 19, 2007, in response to Plaintiff's appeal to final review, the Secretary's Office of Inmate Grievance & Appeals notified Plaintiff that his appeal was filed pending receipt of a copy of Plaintiff's initial grievance, signed and dated. (Doc. 106, Att. 2, Ex. 1, Action Required Letter).

By correspondence dated December 26, 2007, Plaintiff stated that he was in receipt of Chief Grievance Officer Varner's letter requesting a copy of his initial grievance and that Plaintiff had previously supplied a copy his initial grievance when he filed his appeal. (Doc. 114, Ex. 48, Dec. 26, 2007 Letter). Thus, he did not resubmit another copy of his initial grievance.

In a Final Appeal Decision dated January 3, 2008, Plaintiff's final appeal was dismissed for failing to provide the Secretary's Office of Inmate Grievances & Appeals with a copy of his initial grievance. (Doc. 106, Att. 2, Ex. 1, Final Appeal Decision).  Specifically, the Chief Grievance Officer stated the following:

Under the date of December 19, 2007, this office sent you a letter requesting that you provide a copy of your initial grievance signed and dated in order for final disposition to be completed.  We received your letter dated December 26, 2007, in which you do not agree and state that you already forwarded this document.  Upon review of what you previously provided to this office, you did not provide a copy of your initial grievance.  Since you chose not send the requested document, your appeal cannot be accepted and is therefore dismissed.

Id.

### 2. **Medical Treatment**

Rambert was an inmate at SCI-Dallas from January 8, 2001 to October 29, 2009.

(Doc. 110, Ex. G, Rambert Deposition at 11-12).

On August 13, 2002, Rambert slipped while working in the kitchen at SCI-Dallas

and injured his back and neck. Id. at 14-15. He was given pain killers and saw a therapist for about

two to three weeks. Id. Rambert is aware that degenerative joint disease ("DJD") is a condition

which occurs over time. Id. at 17. He believes the fall caused him to have DJD. Id. at 16-17.

According to Department policy DC-ADM 820, effective July 1, 2007, the Department

required inmates to pay a co-payment for his or her medical services. (Doc. 107, Att. 7, DC-ADM

820, Co-Payment for Medical Services at 3). At the time of service, the health care staff shall

inform the inmate whether a fee will be charged. Id. at 4. If a fee is to be charged for the medical

service, the inmate shall sign an authorization form. Id. Certain medical services would not result

in a charge to the inmate, including medical treatment for a chronic disease or illness. Id. at p. 3.

It was the practice at SCI-Dallas to inform the inmates at sick call if they would be charged

a co-payment. (Doc. 107, Att. 6, Declaration of Patricia Ginocchetti, retired Corrections Heath

Care Administrator at ¶ 5). This would be done by the person who assessed the inmate at sick call.

Usually this was done by doctors and Physician's Assistants (PA's). Id. There was also a sign on

the wall of the dispensary which advised the inmates of the requirement for a co-pay and a similar

sign on the PA's desk. Id. Inmates knew of the requirement already by way of the Inmate

Handbook and initial reception procedures. Id. Rambert has a copy of the Inmate Handbook,

which includes a copy of Department Policy DC-ADM 820, relating to co-payments. (Doc. 106,

Att. 1, Rambert Deposition at 140).

The medical provider would decide at sick call if the inmate's condition was chronic or temporary and whether his care would be billable. (Doc. 107, Att. 6, Declaration of Patricia Ginocchetti, retired Corrections Heath Care Administrator at ¶ 6). If the inmate had a chronic condition, it would be listed in his medical record. Id. Instead of cash slips (DC-138-A), inmates were required to sign a sheet at time of sick call. Id. at ¶ 7. This sheet was maintained by the Physician's Assistant. Id. The sheet indicated if the medical service was billable or not. Id. It went to the Business Office. Id.

Effective May 29, 2008, a revised version of the DC-ADM 820 was issued by then Secretary Beard. (Doc. 107, Att. 7, Revised DC-ADM 820, Co-Payment for Medical Services). The revised DC-ADM 820 contained a specific definition of what constituted a chronic medical disease/illness. Id. at 2. It defined Chronic Medical Disease/Illness as: Asthma, Congestive Heart Failure, Coronary Artery Disease, Diabetes, Dislipidemia, Hepatitis C, HIV and Hypertension. Id.

On November 15, 2007, Plaintiff was seen by Physician's Assistant ("PA") Bunk for complaints that he was "never called over for his arch supports" and that "the Feldene does not help the pain in his knees/hip." (Doc. 110, Ex. F, Medical Remarks of Nov. 15, 2007). PA Bunk "advised [Plaintiff] to check with the shoe shop since the order was written and sent to them." Id. Bunk also wrote an order to discontinue Feldene and prescribed 500mg of Disalcid for Plaintiff. (Doc. 110, Ex. F, Physician's Order Form).

On November 27, 2007, Plaintiff was seen by PA O'Brien, complaining of increased pain in his left knee for the past four days. (Doc. 110, Ex. F, Medical Remarks of Nov. 27, 2007). Rambert stated that his knee was "making popping sounds" and that he "couldn't straighten it out." Id. He denied any acute injury. Id. PA O'Brien noted that Rambert wore two open patella knee

sleeves on his left knee. Id. His examination found no swelling or effusion. Id. Plaintiff had full

range of motion without increased discomfort. Id. He was assessed as having left knee discomfort

and a history of mild DJD. Id. PA O'Brien instructed Rambert not to wear two knee sleeves and to

use warm compresses. Id.

On December 14, 2007, Rambert was seen by PA O'Brien, complaining of dry itchy scalp.

(Doc. 110, Ex. F, Progress Notes of Dec. 14, 2007). He had an empty T-Gel shampoo bottle, which

ran out on June 30, 2007, and stated that he wanted "something stronger." Id. PA O'Brien

ordered Selenium Sulfide lotion.  (Doc. 110, Ex. F, Physician's Order Form).

On December 24, 2007, Rambert was again seen by PA O'Brien. (Doc. 110, Ex. F, Progress

Notes of Dec. 24, 2007). He complained that his "right arm/hand is going numb and getting tight

for several days." Id. O'Brien conducted a neurological examination and found a moderate

trapezius spasm. Id. He prescribed warm compresses, gentle stretching exercises and Motrin. Id.

On January 14, 2008, Rambert was seen by a nurse for a transport evaluation. (Doc. 110,

Ex. F, Medical Remarks for Jan. 14, 2008).

On January 20, 2008, Rambert was seen in the Restricted Housing Unit ("RHU") by Dr.

Bohinski with complaints of spasm in his "neck/back/shoulder." (Doc. 110, Ex. F, Medical

Remarks for Jan. 20, 2008). Dr. Bohinski prescribed analgesic balm. (Doc. 110, Ex. F, Physician's

Order Form).

On January 23, 2008, Rambert was seen in the RHU by PA O'Brien, complaining of pain in

his neck, back, right shoulder and both knees." (Doc. 110, Ex. F, Medical Remarks for Jan. 23,

2008). Plaintiff believed the pain started when he arrived in the RHU. Id. He informed O'Brien

that he had no difficulty exercising vigorously in the yard. Id. O'Brien's examination revealed no

discomfort or restrictions. Id. O'Brien recommended hot moist compresses and stretching exercises. Id. O'Brien also prescribed Motrin. (Doc. 110, Ex. F, Physician's Order Form).

On January 29, 2008, Rambert was again seen in the RHU by PA O'Brien. (Doc. 110, Ex. F, Medical Remarks for 1/29/08). Rambert reported the "same problem" in that Plaintiff "get[s] pain in [his] knees, neck, back and shoulder." Id. Although Plaintiff reported that he "don't go to the yard", he was observed "hopp[ing] out of bed and ambulat[ing] to the door without apparent distress/discomfort/difficulty." Id. O'Brien found no swelling in the knee or effusion. Id. Plaintiff was assessed as having "[a]lleged joint pain", id., and prescribed Motrin. (Doc. 110, Ex. F, Physician's Order Form for Jan. 29, 2008).

On February 6, 2008, Rambert was seen in the RHU by PA O'Brien with the complaints of neck, back, hip and shoulder pain. (Doc. 110, Ex. F, Progress Notes for Feb. 6, 2008). He ambulated without discomfort. Id. O'Brien reviewed prior x-rays which showed minimal degenerative joint disease. Id. He was assessed as having arthritic pain, id., and prescribed Motrin. (Doc. 110, Ex. F, Physician's Order Form).

On February 10, 2008, Rambert was seen in the RHU by PA O'Brien with complaints of pain in his neck, back and shoulders. (Doc. 110, Ex. F, Medical Remarks for Feb. 10, 2008). It was noted that he already had Motrin prescribed. Id. Hot compresses and gentle stretching exercises were also prescribed. Id.

On February 12, 2008, Rambert was seen in the RHU by PA Bunk about his medication order. (Doc. 110, Ex. F, Medical Remarks for Feb. 12, 2008). Plaintiff stated that he hadn't "gotten any since [he's] been down here." Id. Plaintiff's record was reviewed to verify his medications. Id.

On February 16, 2008, Rambert was seen in the RHU by a Certified Registered Nurse Practitioner about having his Motrin renewed. (Doc. 110, Ex. F, Medical Remarks for Feb. 16, 2008).  His Motrin was renewed for another ten days.  (Doc. 110, Ex. F, Physician's Order Form).

On February 28, 2008, PA Bunk saw Rambert for back, neck , shoulder and hip pain.  (Doc. 110, Ex. F, Progress Notes for Feb. 28, 2008).  PA Bunk prescribed Advil for ten days.  (Doc. 110, Ex. F, Physician's Order Form).

Rambert was next seen on April 17, 2008 and then on November 31, 2008.  (Doc. 110, Ex. F, Progress Notes).  These were reviews for confinement in the RHU.  Id.

On March 17, 2009, Rambert was seen for lab work, which he refused.  (Doc. 110, Ex. F, Medical Remarks for March 17, 2009).

On March 24, 2009, Rambert was seen for a physical. (Doc. 110, Ex. F, Medical Remarks for March 24, 2009). Rambert agreed to having lab work.  Id.

On April 11, 2009, PA Bunk saw Rambert for a headache "behind his eyes", and an itchy rash on the right side of his neck/throat.  (Doc. 110, Ex. F, Medical Remarks for April 11, 2009). PA Bunk ordered Advil and HCT cream. (Doc. 110, Ex. F, Physician's Order Form).

### 3. **Medical Grievances**

On January 2, 2008, Rambert submitted an Inmate's Request to Staff Member to the Corrections Health Care Administrator stating the following:

> I am writing to your respected office concerning a possible mistake by your staff in which my monthly statement had $5.00 being deducted on 11.27.2007 and $10.00 deducted on 12.14.2007.  Please note that on 11.15.2007 I came to sick call on a cronic (sic) mater in which the PA-C issued me Disalcid for 14 days.  Please note that this was given in place of cronic (sic) Feldene that I have been getting since I was diagnosed with cronic (sic) arthritis March 2003 in which I have been taken up until he changed the Feldene to Disalcid.  On 12.14.2007 I came to sick call

12

concerning bumps and sores in my scalp in which I was prescribed Selenium Sulfide. Please note that this is a cronic (sic) condition, it will reflect in my medical file that Dr. Stanish and Prior PA-C issued me two different shampoos for this continuing condition and as recent as October 2007 during my annual physical Dr. Stanish provided me with the 2.5% Selenium Sulfide lotion of dandruff and seborrheic deratitis, then on 12.24.2007 the PA-C changed the Disalcid to Motrin, please refund!

(Doc. 114, Ex. 78, Inmate's Request to Staff Member).

On January 8, 2008, Defendant Liput responded as follows:

On 11-27-07 you complained about left knee pain. You were billed $5.00 from this visit appropriately on 12-17-07. On 12-14-07, you complained about dry, itchy scalp and were ordered medicated shampoo. You were appropriately charged for this sick call visit as well. Issues such as arthritis, dry skin, are billable. Keep that in mind when you report to sick call. You may want to seek commissary for medicated shampoos and anti-inflamatories such as Motrin.

Id.

On January 13, 2008, Plaintiff filed Grievance No. 214804, stating that on November 27, 2007, he went to sick call to have his medication renewed. (Doc. 110, Ex. C, Official Inmate Grievance No. 214804). He claims that the medication was changed from Feldene to Disalcid. Id. He was charged $5.00 for the visit. Id. He returned on December 14, 2007 for an itchy scalp and was charged $10.00. Id. On December 24, 2007, he returned because the Disalcid was not working and was told to use warm compresses and given Motrin and charged $10.00. Id. He believes all of these charges are in violation of the DOC policy and that the money was taken out of his account illegally. Id.

On January 18, 2008, Grievance No. 214804 was rejected by prison officials because Rambert did not submit it within fifteen (15) working days after he received a charge for the treatment. (Doc. 110, Ex. C, Grievance Rejection Form). On January 30, 2008, Rambert filed an appeal. (Doc. 110, Ex. C, Appeal).

13

On February 4, 2008, the Superintendent responded to Grievance No. 214804 and denied the appeal because the grievance had been filed late. (Doc. 110, Ex. C, Appeal of Unprocessed Grievance # 214804).  However, he also noted that a medical co-pay requirement existed and that Plaintiff's "claim that [he] did not know the monies would be deducted from [his] account is incorrect."  Id.  Rambert filed an appeal to the Secretary's Office of Inmate Grievances.

On March 5, 2008, the Secretary's Office indicated that Rambert's appeal was not complete for final review, as it did not contain a signed and dated appeal to final review. (Doc. 110, Ex. C, Action Required Letter).  The Secretary's Office afforded Plaintiff ten (10) days within which to submit the required documentation, or suffer dismissal of the appeal.  Id.  There is no indication of record that Plaintiff ever submitted the required documentation.

On February 5, 2008, Rambert filed Grievance No. 217116, stating that "$10.00 was illegally taken from [his] account for co-payment on 1.19.08.." (Doc. 110, Ex. D, Official Inmate Grievance No. 217116).  He stated that he had just received his monthly statement which is "in violation of DC-ADM 820 Co-Payment Medical Services v.2.G.J.S.O, totaling $35.00 that has been illegally took from [him]."  Id.

On February 11, 2008, Patricia Ginocchetti responded to Grievance No. 217116 with the following:

> I have been assigned to respond to your grievance regarding co-payment of medical services.
>
> A review of your medical record indicates that you requested sick call service on:
> 1. November 27, 2007, you reported pain in your left knee. You were thoroughly evaluated for your complaints. Health education was provided. In compliance with the policy, you were billed $5.00 for your request.
> 2. December 14, 2007, you reported an "itchy scalp". Medication was ordered. In compliance with the policy you were billed $10.00.

14

3. December 24, 2007, you reported that your right hand/arm were "going numb and getting tight". You were thoroughly assessed for your complaints. Health education was provided. Medication was ordered. In compliance with the policy, you were billed $10.00.

4. January 20, 2008, you offered complaints of pain in your neck, back and shoulder. You were thoroughly evaluated. Medication was ordered. In compliance with the policy, you were billed $10.00.

Money was not taken "illegally from (your) account".

As you are aware, all requests for sick call service are subject to co-payment of services.

I consider this unnecessary, frivolous grievance denied.

(Doc. 110, Ex. D, Official Inmate Grievance Initial Review Response).

On February 20, 2008, Rambert appealed the denial of grievance to the Superintendent. (Doc. 110, Ex. D, Appeal).

On February 25, 20008, the Superintendent denied the appeal, noting that his medical conditions are not considered "chronic" and that the DOC appropriately charged him for his medical treatment. (Doc. 110, Ex. D, Denial of Appeal).

Although Plaintiff submits a copy of a February 26, 2008 letter addressed to Chief Grievance Officer Cindy Watson, stating that he is 'filing this appeal to grievance # 217116 to be processed with your office, enclosed please find a copy of all the originals except the answer from the Superintendent it'll be sent forthwith soon as it is copied", there is no record that a final appeal was ever received and/or filed by the Secretary's Office of Inmate Grievances.

On February 11, 2008, Rambert filed Grievance No. 218224, complaining that PA O'Brien ordered him pain medication but that the medication nurse did not provide it to him. (Doc. 110, Ex.

15

E, Official Inmate Grievance).  He also complained about monies "illegally" being taken out of his

account for medical co-pays.  Id.

On February 21, 2008, the Grievance Officer Patricia Ginocchetti denied the grievance on

the following basis:

> I have been assigned to respond to your grievance regarding co-payment of medical
> services.  A review of our medical record indicates that you requested sick call
> service on:
>
> 1.  January 23, 2008, you informed the P.A. that you,"...got pain in my neck, back,
> right shoulder, and both knees.  It started when I got down here."  It was noted that
> you exercise vigorously in the yard and ambulate without difficulty.  Medication
> was ordered for five days.  Gentle stretching exercises were demonstrated.  There is
> nothing to indicate you were billed.
> 2.  January 29, 2008, you stated, "Same problem.  I get pain in my knee, neck, back
> and shoulder.  I don't go to the yard."  You were in no obvious distress.  It was
> determined you have a history of mild DJD in your knees.  Medication was ordered
> for seven days.  There is nothing to indicate you were billed.
> 3.  February 6, 2008, you informed the P.A., "I still get pain in my neck, back, hip
> and shoulder."  You were thoroughly evaluated.  Medication was ordered for ten
> days.  There is nothing to indicate you were billed.
> 4.  February 10, 2008, you informed the P.A. , "I get pain in my neck, back and
> shoulders."  Hot moist compresses and gentle stretching exercises were ordered.  In
> compliance with the policy you were billed for your request.
>
> The records indicate you received all doses of Motrin that were ordered.  In addition,
> the nurses informed me that you were frequently asked and/or were made aware of
> the status of your medication order.
>
> On February 12, 2008, you requested sick call and informed the P.A., "They told me
> my medication order is out.  I haven't gotten anything since I'm down here."  This
> was determined to be inaccurate.  You were not billed.
>
> On February 16, 2008, you requested sick call and informed the attending P.A., "I
> need Motrin renewed.  I have low back pain and that stuff works."  It was renewed
> for another 10 days.  You were not billed.
>
> Please be informed/reminded that:
> 1.  Chronic conditions are determined by the health care provider.
> 2.  Chronic medical conditions are not the same as chronic requests.

3. X-rays are ordered when the provider determines there is a clinical need.
4. All grievances are expected to be submitted in good faith.

You are not entitled to a $35.00 refund.  Therefore, you frivolous grievance is denied.

(Doc. 110, Ex. E, Official Inmate Grievance Initial Review Response).

On February 28, 2009, Rambert appealed to the Superintendent.  (Doc. 110, Ex. E, Appeal).

On March 5, 2008, the Superintendent denied the grievance, finding that Plaintiff's medical record was thoroughly reviewed and that Plaintiff's claim that money was "illegally" taken was unfounded, as well as Plaintiff's claim that his medication ran out and he had not received any since being placed in the RHU.  (Doc. 110, Ex. E, Appeal Denial).

Although Plaintiff submits a copy of a March 16, 2008 letter addressed to Chief Grievance Officer Cindy Watson, stating "enclosed is the appeal to grievance # 218224, you in conspiracy with these people, you ain't responding to my appeals, you sabotaging, but I keep records of what I do", (Doc. 114, Ex. 119), there is no record that a final appeal was ever received and/or filed by the Secretary's Office of Inmate Grievances.

On May 14, 2008, Rambert filed Grievance No. 228874, challenging the "reissue of DC-ADM 820, Co-Pay for Medical Services, III. Definitions, E Chronic Medical Disease/Illness" in which Plaintiff believes he falls under as a result of his "diagnosis with (DJD) Degenerative Joint Disease, as a result of [his] slipping and falling in the SCI-Dallas kitchen."  (Doc. 114, Ex. 120, Official Inmate Grievance No. 228874).  Additionally, Plaintiff once again challenged the deductions of medical co-pays from his account.  Id.

On June 8, 2008, after having not received a response to Grievance No. 228874, Plaintiff wrote a letter on inquiry to Grievance Coordinator Robin Lucas.  Id. at Ex. 121.

On June 13, 2008, Grievance Coordinator Lucas responded that the grievance had not been processed, but that it was Grievance Officer Leskowsky would be responding shortly. Id.

Grievance No. 228874 was denied by Grievance Officer Leskowsky based on the following:

Be advised that I have been assigned to respond to your grievance regarding the new co-payment charges.

On May 29, 2008, the ADM-820 Co-Payment for Medical Services policy went into effect. The aforementioned policy revision was instituted under the authority of PA Secretary of Corrections Jeffrey A. Beard, Ph. D. We are directed by the aforementioned policy to consider the following medical conditions chronic for the purpose of instituting a medical co-payment charge: <u>Chronic Medical Disease/Illness</u> Chronic Medical Diseases/Illness are defined as: Asthma, Congestive Heart Failure, Coronary Heart Disease, Diabetes, Dislipidemia, Hepatitis C, HIV, and Hypertension.

Medical co-payments are assessed at SCI-Dallas, guided by the Co-Payment for Medical Services Policy. Inmates at SCI-Dallas are charged a medical co-payment that is consistent with what other inmates in the PA DOC are charged.

Degenerative joint disease is a condition that develops with the aging process. You had an x-ray done on your left knee one year ago. The x-ray reported *minimal degenerative changes* in your left knee. On <u>June 6, 2006</u>, you were on sick call where you reported to PA O'Brien that you had pain in both your knees for the past two years (prior). During his assessment, PA O'Brien questioned you regarding injuries to your knees. You denied any injuries to your knees. It is apparent you had the problem with your knees since at least 2004, as you reported to the practitioners on sick call. You were not advised by a medical professional that your knee issue was caused by an injury.

If you request care for your knee issue, you will be charged according to ADM-820 Co-Payment for Medical Services policy.

Your grievance is denied.
The issue with your knees is not considered a chronic medical issue.
You cannot challenge a PA DOC Policy with an inmate grievance.
You will not be refunded the $50.00 co-payments charges that you requested. Your co-payment charges were assessed guided by the PA DOC Co-Payment Policy, by Medical Department Personnel.

(Doc. 114, Ex. 122, Official Inmate Grievance Initial Review Response (emphasis in original)).

18

On June 17, 2009, Plaintiff filed an appeal of the denial of Grievance No. 228874 to Superintendent Klopotoski. (Doc. 114, Ex. 123, Appeal).

On June 24, 2008, Superintendent Klopotoski upheld the initial grievance response. (Doc. 114, Ex. 125, Appeal Denial).

On July 3, 2008, Rambert appealed to the Secretary's Office of Inmate Grievances & Appeals. (Doc. 114, Ex. 126, Appeal).

In a Grievance Referral dated July 24, 2008, Chief Grievance Officer Watson notified Rambert that his appeal had been referred to the Bureau of Health Care Services. (Doc. 114, Ex. 128, Grievance Referral).

In response to an August 24, 2008, letter of inquiry by Plaintiff, Dorina Varner, Acting Chief Grievance Officer informed Rambert that his "grievance was forwarded to the Bureau of Health Care Services for review" and "once their review is complete...final disposition will be rendered." (Doc. 114, Ex. 129, File Without Action letter).

On January 14, 2009, a Final Appeal Decision was rendered, finding the following:

> The Bureau of Health Care Services has reviewed the concerns your grievance and determined that the medical care provided to you by the medical department at SCI-Dallas regarding your medical co-pay charges for treatment of degenerative knee joint disease was appropriate. The findings of the Bureau of Health Care Services review concur with the Initial Review Response dated May 20, 2008. Medical care requested for your knee issue would be subject to co-payment charges according to DC-ADM 820, "Co-Payment for Medical Services." No evidence of neglect or deliberate indifference has been found.

(Doc. 114, Ex. 131, Final Appeal Decision).

### III.   Discussion

#### A.   Fourteenth Amendment Procedural Due Process claims

19

## 1. **Religious Materials**

Plaintiff raises procedural due process claims concerning the confiscation of his property. In this regard, he claims that he did not receive procedural due process regarding the confiscation of his religious literature, in that he was not given the opportunity to have them shipped back to the sender before they were destroyed, and he was not reimbursed for their value.

### a. **Failure to Follow DOC Policy**

Plaintiff alleges that Defendants violated his due process rights by failing to follow Department policy DC-ADM 803VI.E.7, which states that "Incoming mail containing contraband shall be confiscated and held for further inspection and disposition...the contraband shall be returned to the sender (if known), or it shall be destroyed", when they failed to return the religious literature to the sender.

Federal and state regulations in and of themselves do not create a liberty interest in that procedure. See, e.g., Hewitt v. Helms, 459 U.S. 460, 471 (1983) (stating the mere fact of careful procedural structure to regulate use of administrative segregation does not indicate existence of protected liberty interest); McLaurin v. Morton, 48 F.3d 944, 947 (6th Cir. 1995) (concluding that mere procedures do not create any substantive liberty interest, even when phrased in mandatory language); Culbert v. Young, 834 F.2d 624, 628 (7th Cir. 1987) (holding that the adoption of mere procedural guidelines does not give rise to a liberty interest), cert. denied, 485 U.S. 990 (1988); McGuire v. Forr, 1996 WL 131130 (E.D. Pa. 1996) (holding that inmate grievance procedures, in themselves, do not confer a liberty interest protected by the due process clause in the inmate grievance procedures), aff'd, 101 F.3d 691 (3d Cir. 1996). Thus, failure to follow DOC policy does not, in and of itself, result in a violation of due process. Drayton v. Robinson, 719 F.2d 1214, 1218

20

(3d Cir. 1983); Plain v. Flicker, 645 F. Supp. 898, 909 (D.N.J. 1986).  Accordingly, Defendants are entitled to judgment as a matter of law.

### b. **Loss of the Property**

Plaintiff asserts liability for confiscation/destruction of his property as a result of the cell search.  Ordinarily, the concept of "due process" requires some kind of hearing before the state can deprive a person of a protected interest.  Zinermon v. Burch, 494 U.S. 113, 126 (1990) (collecting cases).  However, in cases of random and unauthorized deprivations of property the State cannot predict when the loss will occur and, therefore, is unable to provide a meaningful hearing before the deprivation takes place.  In Parratt v. Taylor, 451 U.S. 527 (1981), the Supreme Court determined that, with respect to negligent, random and unauthorized acts by state actors that result in the loss of a protected interest, a plaintiff does not suffer a violation of procedural due process if he or she has an adequate post-deprivation remedy.  In Hudson v. Palmer, 468 U.S. 517 (1984), the Supreme Court extended the rule in Parratt to apply to intentional acts by state actors.

The Third Circuit Court of Appeals has held that the DOC's grievance procedure provides an adequate post-deprivation remedy, see e.g. Tillman v. Lebanon County Corr. Fac., 121 F.3d 410, 422 (3d Cir. 2000), and that the existence of this post-deprivation remedy forecloses any due process claim, Austin v. Lehman, 893 F. Supp. 448, 454 (E.D. Pa.1 995), even if an inmate is dissatisfied with the result of the process.  Iseley v. Horn, 1996 WL 510090, at * 6 (E.D. Pa. 1996).  "As [the inmate plaintiff] admits to having used the grievance procedure to attempt the return of his [property], he had access to an adequate post-deprivation remedy and even if there had been a violation of his liberty interest he was not denied the right to due process of law".  Brooks v. DiGuglielmo, 2008 WL 5187529, * 6 (E.D. Pa. 2008) (footnote omitted).  See also Monroe v.

Beard, 536 F.3d 198, 210 (3d Cir. 2008) (stating, "[b]ecause prisons are constitutionally required to afford inmates only a post-deprivation remedy, we agree that the defendants' failure to give the inmates prior notice of their intended seizure of their materials did not violate the plaintiffs' Due Process rights").

Monroe dealt with the intentional confiscation of inmate property pursuant to official prison policy. Id. In Monroe, the inmates objected to a Department of Corrections policy that allowed the confiscation of UCC-related material and forms, which inmates had used to file fraudulent liens and judgments against officials. Id. The Third Circuit Court of Appeals held that the failure to give the inmate prior notice of the seizure of these materials did not violate their due process rights. Id. It also found that the Department afforded the inmates a meaningful post-deprivation remedy in the form of the inmate grievance system and a special process for objecting to the seizures. Id. The Court stated: "Although the plaintiffs allege that the defendants have not adhered to their own procedure, they have not shown that this post-deprivation procedure was not meaningful." Id. Likewise, in Tillman, the Third Circuit Court of Appeals held that the plaintiff inmate had an adequate post-deprivation remedy in the form of the prison grievance program. 221 F.3d at 422.

Similarly, in this case, the prison officials were not obligated to give Plaintiff prior notice of the seizure of his envelope. Plaintiff was notified via the Confiscation Slip and the response to his grievance, the reason for seizing the material from K.A.M., Inc. Specifically, that the sender was a Security Threat Group. As such, there existed a legitimate penological reason to seizure the material. While Plaintiff may disagree with that designation, there is no dispute that the Department of Corrections considered it a STG. Just as the seizure and destruction of UCC-related

22

material and forms was justified in <u>Monroe</u>, so was the seizure of the K.A.M., Inc. material justified here.

However, even if not justified, Plaintiff was provided with a meaningful post-deprivation remedy with regard to the confiscated material. He availed himself of the remedy by filing Inmate Grievance No. 200984, concerning the confiscated material. Consequently, Plaintiff's claim concerning his confiscated property fails as a matter of law to state a constitutional violation as required under 42 U.S.C. § 1983. Accordingly, Defendants are entitled to summary judgment as to this claim.

### 2. **Medical Co-Payments**

Plaintiff claims that Defendants deducted monies from his inmate account for medical expenses, without appropriate notice, and in violation of DOC policy, as it existed at the time, because Plaintiff's medical needs were classified as chronic and exempt from payment.

To establish a due process violation under the Fourteenth Amendment a plaintiff must demonstrate that the defendants deprived him of either a property or liberty interest. <u>Daniels v. Williams</u>, 474 U.S. 327, 339 (1986). Property rights are basic civil rights and a deprivation of property without due process gives rise to a claim under section 1983. <u>Lynch v. Household Fin. Corp.</u>, 405 U.S. 538, 552 (1972). Inmates have a protected property interest in the funds in their prison accounts, <u>Reynolds v. Wagner</u>, 128 F.3d 166, 179 (3d Cir. 1997). Accordingly, "inmates are entitled to due process with respect to any deprivation of money [from their accounts]." <u>Higgins v. Beyer</u>, 293 F.3d 683, 693 (3d Cir. 2002) (citations omitted).

In <u>Reynolds</u>, the Third Circuit Court of Appeals upheld the constitutionality of a county prison policy, which assessed small co-payments for medical care. 128 F.3d 166. The inmate

handbook explained certain exceptions to the medical co-pay requirement. Id. An inmate who

disagreed with a fee assessment, could file a grievance on the matter. Id.  In finding no violation of

the Due Process Clause, the Court noted: "Moreover, this is not a situation in which the inmates are

deprived of the benefits of their property and receive nothing in return; rather in exchange for the

fees, the inmates receive the benefit of health care, the value of which undoubtedly exceeds the

modest fee assessed." Id.

In the instant action, Plaintiff had sufficient prior notice of the DC-ADM 820 policy relating

to medical co-payments.  The policy was contained in the Inmate Handbook, which the Plaintiff

admitted to having.  See (Doc. 106, Rambert Deposition at 140).  In addition, there were signs

posted in the prison dispensary, which reminded the inmates of the medical co-payment

requirement, as well as the requirement that inmates sign a sheet when they came to sick call[3].

However, even if Plaintiff were completely unaware of the policy, he was certainly on notice after

receipt of the response to his January 2, 2008, Inmate's Request to Staff Member.

In his grievances, Plaintiff argues that his degenerative joint disease should have been

considered a chronic condition.  However, regardless of how strongly Plaintiff argues that his

degenerative joint disease is a chronic condition, that term simply does not appear in the definition

of what is chronic for purpose of the DC-ADM 820.   Thus, Plaintiff's argument that Defendants

failed to follow Department Policy when they billed him for various visits is without merit.

---

3 .    To the extent that Plaintiff objects to the fact that medical staff at SCI-Dallas had him sign a
sheet when he came to sick call, as opposed to a separate cash slip as required under DC-ADM
820, this failure does not rise to the level of a constitutional violation.  It was merely more efficient
to have the inmates sign the same sheet instead of individual cash slips.  In addition, even
assuming that Plaintiff was erroneously billed for various sick call visits, he had an adequate
post-deprivation remedy in the form of the Department's inmate grievance system.

To the extent that Plaintiff also argues that he should not have been charged a medical co-pay because the medical care fell within the exemption for work-related injuries[4], Plaintiff was injured while working in 2002, years before he was charged the medical co-pays.  Moreover, Plaintiff's medical records do not support the proposition that Plaintiff's pain is directly related to an event which occurred in 2002.  Accordingly, the Court finds Plaintiff's argument meritless.

Finally, the Plaintiff had an adequate post-deprivation remedy in the form of the Department's inmate grievance system.  The courts recognize that the post-deprivation remedy provided through DOC's Grievance policy, DC-ADM 804, and Pennsylvania state law are adequate to provide inmates with procedural due process protection from the taking of co-pay funds from their accounts.  See, e.g., Scott v. Angelone, 1992 WL 354598, *4 (9th Cir. 1992) (unpublished disposition) (finding advanced notice of program's implementation and right to file grievance with respect to particular charges constitute adequate pre- and post-deprivation procedures sufficient to protect inmate's due process rights under inmate co-pay program); Reynolds v. Wagner, 936 F. Supp. 1216, 1228 (E.D. Pa. 1996) (same); Morales v. Beard, 2009 WL 2413425, *1 (W.D. Pa. 2009) (same); Robinson v. Fauver, 932 F. Supp. 639, 645 (D.N.J. 1996) (rejecting equal protection and due process challenges to New Jersey's inmate co-payment system); Johnson v. Dep't of Public Safety, 885 F. Supp. 817, 821 (D.Md. 1995) (rejecting due process challenge).

Here, the DOC policy provides advance notice of the fee and the DOC grievance system provides an adequate post-deprivation remedy to protect Plaintiff's due process rights.  Defendants are therefore entitled to summary judgment as a matter of law.

---

4 .    One of the exemptions included in DC-ADM 820 is "medical service provided as a result of an injury or illness arising from an inmate's facility work assignment."  See (Doc. 107, Att. 7, Revised DC-ADM 820, Co-Payment for Medical Services).